**UNITED STATES DISTRICT COURT FOR**
**EASTERN DISTRICT OF PENNSYLVANIA**

**CHESTER COUNTY SPORTS ARENA,**

**Plaintiff,**

**vs.**

**THE CINCINNATI INSURANCE**
**COMPANY,**

**Defendant.**

**JURY TRIAL DEMANDED**

**Case No. 2:20-cv-02021-TJS**

## <u>ORDER</u>

AND NOW, on this _____day of _____ , 2020, upon consideration
of the motion by Defendant The Cincinnati Insurance Company to Dismiss Plaintiff's Complaint,
and any response to it, it is hereby ORDERED that the Motion is GRANTED.

BY THE COURT:

_____
J .

**UNITED STATES DISTRICT COURT FOR**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHESTER COUNTY SPORTS ARENA,**<br><br>                    **Plaintiff,**<br><br>     **vs.**<br><br>**THE CINCINNATI INSURANCE**<br>**COMPANY,**<br><br>                    **Defendant.** | **JURY TRIAL DEMANDED**<br><br>**Case No. 2:20-cv-02021-TJS** |

**MOTION BY THE CINCINNATI INSURANCE COMPANY TO**
**DISMISS PLAINTIFF'S COMPLAINT**

Defendant The Cincinnati Insurance Company moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of Plaintiff Chester County Sports Arena.  In support of this motion, The Cincinnati Insurance Casualty Company relies on and incorporates by reference the accompanying memorandum of law and exhibits.

**LITCHFIELD CAVO LLP**

BY:   /s/ Lawrence M. Silverman
        Lawrence M. Silverman
        (Bar ID No. 17854)
        Daniel G. Litchfield
        (Bar ID No. 75064)
        1515 Market Street, Suite 1220
        Philadelphia, PA  19102
        Telephone:  215.557.0111
        Facsimile:  215.557.3771
        silverman@litchfieldcavo.com
        litchfield@litchfieldcavo.com

**UNITED STATES DISTRICT COURT FOR**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHESTER COUNTY SPORTS ARENA,** | |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | **Case No. 2:20-cv-02021-TJS** |
| **THE CINCINNATI INSURANCE COMPANY,** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CINCINNATI INSURANCE COMPANY'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Pursuant to Fed.R.Civ.P. 12(b)(6) and L.R. 7.1, The Cincinnati Insurance Company ("Cincinnati") moves to dismiss this case because the Plaintiff fails to state a claim on which relief may be granted. Based on the allegations of the Amended Complaint ("the Complaint") and the plain language of Cincinnati's insurance policy ("the Policy"), Plaintiff cannot prove its claims.

## OVERVIEW AND SUMMARY OF ARGUMENT

The Policy at issue supplies property insurance coverage. It operates to indemnify loss or damage to property, such as in the case of a fire or storm. Coronavirus (or "COVID-19") does not damage property; it hurts people. Plaintiff demands the Policy's Business Income, Extended Business Income, Extra Expense, and Civil Authority coverages. But, because they are part of a property insurance policy, these coverages protect Plaintiff only for income losses tied to physical damage to property, not for economic loss caused by governmental or other efforts to protect the public from disease. Plaintiff's allegations establish that Plaintiff has not sustained any losses attributable to direct physical loss to property. Rather, Plaintiff alleges that the Coronavirus

pandemic spreads COVID-19 among humans. Moreover, the same direct physical loss requirement applies to all of the coverages for which Plaintiff sues—including the Extended Business Income coverage, the Extra Expense coverage, and the Civil Authority coverage.

At bottom, Plaintiff bears the initial burden of showing actual direct physical loss to property. This is always necessary to make a *prima facia* case for property insurance coverage. Yet, Plaintiff's allegations establish that it has not sustained any direct physical loss. Rather, Plaintiff asks this Court to find the Policy applies to cover purely financial losses sustained as a result of Governor Wolf's Closure Order of March 19, 2020 that required non-essential businesses to cease in-person operations. But, because direct physical loss is a fundamental prerequisite to coverage under the Policy, they ask for a vast extension of Pennsylvania law that would create coverage from whole cloth. This should not be permitted.

For all of the reasons, and for the other reasons established below, Plaintiff's Complaint should be dismissed.

## STATEMENT OF FACTS

### I.   Allegations of the Complaint

The Complaint includes the following allegations:

- Chester County Sports Arena owns, operates, manages, and/or controls a multi-sport rink as a community host to social and sporting events at its facility located at 4533 West Lincoln Highway in Downingtown, PA 19335. (Compl. at ¶ 12).

- Defendant The Cincinnati Insurance Company issued Policy Number ENP 043 29 12 to the Plaintiff for the period of April 5, 2017 to April 5, 2020. The Plaintiff has an agreed proposal in place for coverage starting on April 5, 2020 as well. (Compl. at ¶ 13).

- The Policy provides, among other things property, business personal property, business income and extra expense, contamination coverage, and additional coverages. (Compl. at ¶ 16).

2

- Under the Policy, insurance is extended to apply to the actual loss of business income sustained and the actual, necessary and reasonable extra expenses incurred. (Compl. at ¶ 18).

- The Policy is an all-risk policy, insofar as it provides that covered causes of loss under the policy means direct physical loss or direct physical damage unless the loss is specifically excluded or limited in the Policy. (Compl. at ¶ 19).

- The scientific community, and those personally affected by the virus, recognize the Coronavirus (also known as Covid-19) as a cause of real physical loss and damage. It is clear that contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces of the offices and retail store constituting the Insured Property. (Compl. at ¶ 21).

- The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. See https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020). (Compl. at ¶ 22).

- The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19. (Compl. at ¶ 23).

- The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials, "fomites," for up to twenty-eight (28) days. (Compl. at ¶ 24).

- China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to re-open publicly due to the intrusion of microbials. (Compl. at ¶ 25).

- On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency, the first formal recognition of an emergency situation in the Commonwealth as a result of COVID-19. (Compl. at ¶ 26).

- On March 19, 2020 Governor Wolf issued an Order requiring all non-life-sustaining businesses in Commonwealth to cease operations and close all physical locations. Businesses that were permitted to remain open were required to follow "social distancing practices and other mitigation measures defined by the Centers for Disease Control." (Compl. at ¶ 27).

- On March 23, 2020, Governor Wolf issued a Stay-at-Home Order for residents of Philadelphia, Allegheny, Bucks, Chester, Delaware, Monroe, and Montgomery Counties. On that same date, the Pennsylvania Department of Health issued a similar Order, noting that "operation of non-life-sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID–19." (Compl. at ¶ 28).

- On April 1, 2020, Governor Wolf extended the March 23, 2020 Stay at Home Order to the entire Commonwealth of Pennsylvania. (Compl. at ¶ 29).

- Governor Wolf and Pennsylvania Secretary of Health have now extended the Statewide stay-at-home orders through Friday, May 8, 2020. (Compl. at ¶ 33).

- These Orders and proclamations, as they relate to the closure of all "non-life-sustaining businesses," evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property. This is particularly true in places where business is conducted, such as Plaintiffs', as the requisite contact and interaction causes a heightened risk of the property becoming contaminated. (Compl. at ¶ 34).

- As a result of the Orders referenced herein, Plaintiff ceased all operations on March 13, 2020 and continues to be shutdown. (Compl. at ¶ 35).

- The Insured Property is more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain viable for far longer as compared to other facilities with open-air ventilation. (Compl. at ¶ 38).

- Plaintiff's business is also highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the activities of the guests and the staff require them to work in close proximity to the property and to one another in innately physical, athletic endeavors. (Compl. at ¶ 39).

- Plaintiff does not seek any determination of whether the Coronavirus is physically in or at the Insured Property, amount of damages, or any other remedy other than declaratory relief. (Compl. at ¶ 48).

The Complaint seeks a declaratory judgment that:

- the Orders constitute a prohibition of access to Plaintiff's Insured Property

- the Orders specifically prohibit access as defined in the Policy

- the Orders trigger coverage

4

- the Policy provides coverage to for any current and future closures in Chester County due to physical loss or damage directly or indirectly from the Coronavirus under the Civil Authority coverage parameters

- the Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the insured premises or immediate area of the Insured Property

- the Policy provides coverage for any current and future closures of businesses such as Plaintiff's in Chester County due to physical loss or damage from the Coronavirus    and the policy provides business income coverage in the event that Coronavirus has caused a loss or damage at the  Insured Property.

(Compl. at ¶ 44).

## II.      The Plaintiff's Policy

### A.       The Insurance Policy at Issue

Cincinnati issued Policy No. ENP 043 29 12 to Plaintiff for a policy period of April 5, 2017 to April 5, 2020. (Ex. A, Policy, pp. 1 & 6).[1] Cincinnati renewed on April 5, 2020 (Compl. at ¶ 13). Cincinnati issued the Policy in Pennsylvania. The Policy insures Plaintiff's premises in Downingtown, Pennsylvania. (Policy, p. 5; *and see* Compl. at ¶ 13).

For present purposes, the pertinent forms are the Building and Personal Property Coverage Form, forms FM 101 04 04 and FM 101 05 16, and the Business Income (and Extra Expense) Coverage Form, forms FA 213 04 04 and FA 213 05 16.[2] The Building and Personal Property

---

[1]Plaintiff incorporated only a portion of the Policy as Exhibit A to its Complaint.  For the convenience of the Court, the complete expired Policy is also attached hereto as Exhibit A and referred to herein as "Policy." Page references are to the Bates stamped page numbers in the footer of Exhibit A. The Court may take judicial notice of the Policy. *See, e.g., Hynoski v. Columbia Cty. Redevelopment Auth.*, 941 F. Supp. 2d 547, 555 (M.D. Pa. 2013) ("The court may . . . take judicial notice of certain facts, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.")

[2] Forms FM 101 04 04 and FA 213 04 04 are part of the Policy that expired on April 5, 2020. The Policy, as renewed on April 5, 2020, contains forms FM 101 05 16 and FA 213 05 16, which are more recent editions of the Building and Personal Property Coverage Form and the Business Income (and Extra Expense) Coverage Form. As will be shown, there are no material differences in the coverage provided by the pertinent coverage forms in the Plaintiff's original and renewed Policy. The "05 16" forms are attached as Exhibit B and are referred to herein as the "Renewal Forms." Page references to Exhibit B refer to the Bates stamped page numbers in the footer of Exhibit B. The Court may take judicial notice of the Renewal Forms. See fn 1.

Coverage form, FM 101 04 04 / FM 101 05 16, is the main property coverage form. The Business

Income (and Extra Expense) Coverage form, FA 213 04 04 / FA 213 05 16, addresses business

income and extra expense. Both editions of forms FM 101 and FA 213 supply Business Income

and Extra Expense Coverage, but only if the necessary elements for coverage are satisfied. Both

editions of form FM 101 and FA 213 also contain the Extended Business Income and Civil

Authority coverages at issue in the Complaint.

>    **B.     The Policy's Direct Physical Loss Requirement**

The requirement of "direct physical loss" is a core element in property insurance policies

like Plaintiff's, and appears in multiple places in the policy. For example, direct physical loss to

the Plaintiff's property is required for Business Income coverage:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due
> to the necessary "suspension" of your "operations" during the "period of restoration." The
> "suspension" must be caused by ***direct physical*** "loss" to property at a "premises" caused
> by or resulting from any Covered Cause of Loss.

(Policy, p. 38) (emphasis added). Covered Cause of Loss is defined as "***DIRECT PHYSICAL***

***LOSS***" unless the "loss" is excluded or limited in the Coverage Part. (Policy, p. 27) (capitalization

in original; emphasis added).  "Loss" is defined as "accidental loss or damage." (Policy, p. 56).

Likewise, direct physical loss to the Plaintiff's property is required for Business Income

Coverage under Form 213 04 04 of the Policy:

> We will pay for the actual loss of Business Income you sustain due to the necessary
> "suspension" of your "operations" during the "period of restoration". The
> "suspension" must be caused by ***direct physical "loss"*** to property at a "premises"
> which is described in the Declarations and for which a Business Income Limit of
> Insurance is shown in the Declarations. The "loss" must be caused by or result from
> a ***Covered Cause of Loss***.

 (Policy, p. 80)  (emphasis added). Again, Covered Cause of Loss is defined as "***DIRECT***

***PHYSICAL LOSS*** unless the 'loss'" is excluded or limited by the applicable coverage forms.

(Policy, p. 81) (capitalization in original; emphasis added). "Loss" is defined as "accidental loss or damage." (Policy, p. 87).

Under the Renewal Forms, the requirement of physical loss is embedded in the definition of loss: "'Loss' means accidental physical loss or accidental physical damage." (Ex. B, Renewal Forms, pp. 40 & 51).

Furthermore, the requirement of direct physical loss applies to any coverage requiring a Covered Cause of Loss. A Covered Cause of Loss and thus direct physical loss, is an express requirement for coverage under each of the particular coverages Plaintiff seeks. (*See* Policy, pp. 27 & 81).  Similarly, a Covered Cause of Loss, and thus, direct physical loss is an express requirement for coverage under the Renewal Forms (*See* Renewal Forms, pp. 7, 40, 44 & 51). Additionally, the Extended Business Income coverage does not apply unless the insured first sustains a "'Business Income' 'loss' payable under [the Policy]." (Policy, pp. 40 & 81-82; Renewal Forms, pp. 22 & 45). Thus, direct physical loss is required for Extended Business Income coverage both because of the requirement of a Covered Cause of Loss and the express requirement of the Business Income coverage as stated.

Furthermore, while the definition of Covered Cause of Loss refers to exclusions, exclusions do not come into play unless there is first direct physical loss. See, e.g., *Erie Ins. Grp. v. Catania*, 95 A.3d 320, 322 (2014) ("In actions arising under an insurance policy [Pennsylvania] courts have established a general rule that it is a necessary prerequisite for the insured to establish that his claim falls within the coverage provided by the insurance policy."); *Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013)

C.      **Additional Requirements for Coverage Under the Policy**

Among the requirements for Civil Authority coverage is the requirement of direct physical loss to property other than property at the insured's premises. Additionally, there must be a prohibition of access to the insured's premises. (Policy, pp. 39 & 81; Renewal Forms, pp. 21 & 44).[3]

# ARGUMENT

I.      **Motion to Dismiss Standard**

Dismissal is an appropriate mechanism here because this motion presents a pure question of law. A motion to dismiss for failure to state a claim should prevail if, after the complaint's allegations are taken as true and all reasonable inferences are made in favor of the nonmoving party, the nonmoving party cannot prove facts supporting its claim. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter to show the claim for relief is "plausible on its face." *Warren Gen. Hosp.*, 643 F.3d at 84; *and see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), *citing Twombly,* 550 U.S. at 570. A claim does not meet the plausibility standard unless it includes enough factual content to "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Importantly, legal conclusions and other unsupported conclusions stated in the Complaint may not be considered in determining a motion to dismiss. *See, e.g., Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

_____

[3] There are other requirements for Civil Authority coverage that Cincinnati does not rely on for this motion. However, Cincinnati does not waive the right to raise those requirements at a later time.

to legal conclusions."); *Fischbein v. Olson Research Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020) (In determining whether plaintiff has stated a claim sufficient to survive a motion to dismiss, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007), *cert. denied*, 552 U.S. 1021 (2007) (On a motion to dismiss, the Court does not accept as true "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.") (internal citations and quotations omitted).

Additionally, the Court should consider the insurance Policy and the Closure Order in ruling on this motion. *See, e.g., Doe v. Univ. of Sciences*, 961 F.3d 203 (3d Cir. 2020) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint[,] exhibits attached to the complaint, and matters of public record. In addition, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'") (alteration in original; internal citations omitted); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The Closure Order is a matter of public record and is attached as Exhibit C to this brief.[4]

Here, the Complaint's allegations are in conflict with the terms of the Policy and the Closure Order. This means that the Policy and the Closure Order control. *See, e.g.*, *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859, n. 8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written

---

[4] Governor Wolf's Order of March 19, 2020 is the only closure order alleged in the Complaint, (Compl. at ¶ 27). It was cited but it was not attached to the Complaint; rather, Plaintiff provided a link to the order: https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

instrument will control."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (collecting cases).

Indeed, dismissal for failure to state a claim is appropriate where, as here, the plain and unambiguous language of the parties' contract shows the plaintiff cannot "plausibly allege" its contradictory interpretation. *D & M Sales, Inc. v. Lorillard Tobacco Co.*, No. CIV.A.09-2644, 2010 WL 786550, at *4 (E.D. Pa. Mar. 8, 2010) (Padova, D.J.). In this context, any amendment of the complaint would be futile since "[p]laintiff cannot state a claim in light of the controlling contractual terms." *D & M Sales, Inc.*, No. CIV.A.09-2644, 2010 WL 786550, at *4.

## II. There is No Direct Physical Loss and Therefore No Coverage

As shown, the Policy only provides coverage where there is direct physical loss. But, the Complaint does not allege facts showing any direct physical loss to any property. In fact, Plaintiff coyly acknowledges this failure by stating in the Complaint: "Plaintiff does not seek any determination of whether the Coronavirus is physically in or at the Insured Property, amount of damages, or any other remedy other than declaratory relief." (Compl. at ¶ 48). As shown, the mere presence of the virus on a premises does not constitute direct physical loss. But even assuming that it did, Plaintiff eschews any thought that the virus was on its premises. Admittedly, Plaintiff cannot possibly prove its claim.

### A. There Are No Facts to Show Plaintiff's Property was Physically Altered, thus there is No Direct Physical Loss

Plaintiff asks the Court to create coverage where there is none. This is not allowed. Under

Pennsylvania law, "When the terms of an insurance policy are clear and unambiguous, the court is bound to give effect to the policy and cannot interpret the policy to mean anything other than what it says." *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 691 (E.D. Pa. 2017) (Baylson, J.) (internal quotations omitted), *citing Clarke v. MMG Ins. Co.*, 100 A.3d 271, 275 (Pa. Super. Ct. 2014); *Byoung Suk An v. Victoria Fire & Cas. Co.*, 113 A.3d 1283, 1288 (2015) (It is "well settled" that "courts should not 'under the guise of judicial interpretation,' expand coverage beyond that provided in the policy."), *citing Guardian Life Ins. Co. of America v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984).

No case, in Pennsylvania or elsewhere, has held that the existence of a virus constitutes direct physical loss to property such as buildings. Moreover, even if the Coronavirus could cause direct physical loss to property, which it cannot, the only loss alleged here is not physical loss to property, but a purely financial loss. (Compl. at ¶ 41). As such, Plaintiff cannot plausibly argue that the virus or the Closure Orders caused any physical alteration to its property that could trigger coverage.

### 1.    Pennsylvania Law Requires Physical Alteration to Property; There is None Here

Financial losses unrelated to physical loss or physical damage at the insured premises do not satisfy the Policy's direct physical loss requirement. *Philadelphia Parking Authority v. Fed. Ins. Co.,* 385 F. Supp. 2d 280 (S.D.N.Y. 2005) (applying Pennsylvania law), is analogous to this case. There, the plaintiff operated a parking garage at the Philadelphia International Airport. *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 281. Since its garage depended on the airport to attract customers, it sustained a significant loss of business when the FAA grounded all flights in the United States following the 9/11 terrorist attacks. *Philadelphia Parking Auth.*, 385 F. Supp. 2d

at 282-283. Plaintiff sought business income, extra expense, and civil authority coverage under its property insurance policy.

The business income, extra expense, and civil authority coverage provisions in *Philadelphia Parking Authority* were substantially similar to those in the Policy here. Philadelphia Parking Authority's business income coverage applied to the insured's loss of income during the "period of indemnity" in the event of an actual interruption of the insured's business, provided that the "actual interruption of [Philadelphia Parking Authority's] operations [was] caused by ***direct physical loss or damage*** caused by a covered cause of loss . . . ." *Id*. at 282 (emphasis added). Similarly, the civil authority coverage only applied in the event "a civil authority ***prohibits*** access to [Philadelphia Parking Authority's] covered property because of ***direct physical loss or damage*** caused by a covered cause of loss to property not otherwise excluded in the vicinity of [Philadelphia Parking Authority's] covered property." *Id.* (emphasis added).

*Philadelphia Parking Authority* holds that these provisions unambiguously require that "a 'covered cause of loss' . . . result in some 'direct physical loss or damage,' which in turn must interrupt the insured's business operations." And, "***the claimed loss or damage must be physical in nature***." *Id.* at 288 (emphasis added). *Philadelphia Parking Authority* dismisses the complaint because it did not allege any physical loss or damage to the parking garage or other property in its vicinity. *Id.* at 287. As such, the claim "clearly [did] not fit the plain language of the Business Income Provision." *Id*.

Here, Plaintiff's factual allegations show there was no direct physical loss. Nowhere in its Complaint does Plaintiff assert the Coronavirus was even present at its premises. Plaintiff merely asserts, without pleading a single fact, that its "property is more susceptible to being or becoming contaminated." (Compl. at ¶ 38).  Instead, Plaintiff alleges that financial losses it sustained because

of the Closure Order constitute direct physical loss. (*See, e.g.,* Compl. at ¶ 34). But, like the virus, the Closure Order did not physically alter any property. Rather, the Complaint alleges that because of the "Orders referenced herein, plaintiff ceased all operations on March 13, 2020 and continues to be shutdown (sic)." [5] (Compl. at ¶ 35). But, Plaintiff admits this was done to prevent exposure to a virus. (Compl. ¶ 23). Humans infecting humans—through direct contact, or otherwise—is not direct physical loss to property.[6]

In essence, Plaintiff asserts that the Policy's direct physical loss requirement is met whenever a business suffers economic harm. This is contrary to *Philadelphia Parking Authority* and a host of other cases holding that direct physical loss requires actual, tangible, permanent, physical alteration of property, as discussed below.

> ### 2.   *Philadelphia Parking Authority* **is to the Same Effect as the Prevailing Law Nationally**

*Philadelphia Parking Authority* is consistent with the prevailing law nationally. *See, e.g.*, 10A *Couch on Ins.* § 148:46 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, **is widely held** to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (Emphasis added) (collecting cases); *see also Source Food Tech., Inc. v. U.S. Fid.*

---

[5] Again, Governor Wolf issued only one closure order, March 19, 2020.  See, fn. 2. The other orders referred to in the Complaint are a Proclamation of Disaster Emergency issued by Governor Wolf on March 6, 2020 (Compl. Ex. 2); Emergency Order Regarding the Operation of Non-Essential Businesses issued by the Mayor of Philadelphia on March 22, 2020. (Compl. Ex. 3). [Plaintiff's business is not in Philadelphia]; Governor Wolf's Stay at Home Order issued March 23, 2020. (Compl. Ex. 4); and the Stay at Home Order of the Secretary of the Pennsylvania Department of Health issued March 23, 2020. (Compl. Ex. 5).

[6] The Court may take judicial notice of the fact that life-sustaining businesses were permitted to remain open. And, further, that the Closure Order permitted non-essential business premises to remain open for certain activities e.g., food pickup and delivery, and to perform minimum basic operations. (*See* Ex. C, p. 2; *and see* https://www.governor.pa.gov/wp-content/uploads/2020/04/Life-Sustaining-Business-Frequently-Asked-Questions-4.20.20-2.pdf (see pg. 4 at ¶ 14) (last visited July 20, 2020). Thus, the Closure Order was not issued as a result of any direct physical loss to anybody's property and it did not prohibit access to Plaintiff's property.

& *Guar. Co.,* 465 F.3d 834 (8th Cir. 2006) (applying Minnesota law); *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co*., 400 F.3d 613 (8th Cir. 2005) (applying Minnesota law); *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970, 978-979 & n. 4 (D. Kan. 2016) (applying Kansas law) (the phrase "physical loss or damage" "***unambiguously***" requires "***physical alteration***" of property) (emphasis added); *NE. Georgia Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-CV-00245-WCO, 2014 WL 12480022, at \*6 (N.D. Ga. May 23, 2014) (applying Georgia law) ("The court will not expand 'direct physical loss' to include loss-of-use damages when the property has not been physically impacted in some way. To do so would be equivalent to erasing the words 'direct' and 'physical' from the policy."); *J. O. Emmerich & Assocs., Inc. v. State Auto Ins. Companies*, No. 3:06CV00722-DPJ-JCS, 2007 WL 9775576, at \*3 (S.D. Miss. Nov. 19, 2007) ("Plaintiff's interpretation of the [insurance] contract would render the words 'direct' and 'physical' meaningless in the context of the policy.") (collecting cases); *Gavrilides Management Company et al. vs. Michigan Insurance Company*, Case No. 20-258-CB-C30 (July 2, 2020, Ingham County, MI) ("Direct physical loss of or damage to the property "has to be something with material existence. Something that is tangible. Something . . . that alters the physical integrity of property."); *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15 (the Coronavirus damages lungs; not printing presses).[7]

 *Source Food* is a seminal case concerning the direct loss requirement. There, an embargo on the importation of Canadian beef due to mad cow disease prevented a truck carrying the insured's beef product, which was not itself contaminated, from crossing the border. *Source Food,*

---

[7] No written opinions have been issued in *Gavrilides Management Company* and *Social Life* at the time of filing this brief. The oral arguments and the Court's oral ruling in *Gavrilides* are available for viewing on YouTube: https://www.youtube.com/watch?v=Dsy4pA5NoPw&feature=youtu.be.  A copy of the hearing transcript is also attached for the Court's convenience as Exhibit D. A copy of the hearing transcript in *Social Life* is available through the Federal Court's filing system, PACER, and is attached for the Court's convenience as Exhibit E.

465 F.3d at 835. As a result, the insured sustained significant financial losses because it could not fill its customers' orders. *Source Food,* 465 F.3d at 835.

Source Food claimed lost business income under its insurance policy. That policy, like the Policy here, covered the suspension of business operations "caused by *direct physical loss to Property*". *Id*. (Emphasis in original). Source Food argued "that the closing of the border caused direct physical loss to its beef product because the beef product was treated as though it were physically contaminated by mad cow disease and lost its function." *Id.* at 836. *Source Food* rejects this argument: "To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word 'physical' meaningless." *Id.* at 838.

*Pentair* is to the same effect. *Pentair* rejects the insured's contention that its Taiwanese suppliers' inability to function after a loss of power caused by an earthquake constituted direct physical loss or damage. *Pentair*, 400 F.3d at 616. *Pentair* holds that loss of use or function can be relevant to determining the amount of loss, *but only once the insured first establishes physical loss or damage*. *Id*. ("Pentair's argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose.") (Emphasis in original).

*Source Food* and *Pentair* are well-reasoned cases and should be followed. Moreover, there are no material differences between Minnesota's and Pennsylvania's respective decisions on pertinent insurance law issues. Both states seek to apply the plain meaning of an insurance policy. *See, e.g., Reeves v. Travelers Companies*, 296 F. Supp. 3d at 691, *citing Clarke*, 100 A.3d at 275 (Pa. Super. Ct. 2014); *Guardian Life Ins. Co. of America v. Zerance,* 479 A.2d at 953; *accord, Depositors Ins. Co. v. Dollansky,* 905 N.W.2d 513, 515 (Minn. Ct. App. 2017), *aff'd*, 919 N.W.2d

15

684 (Minn. 2018). As such, it is appropriate for this Court to follow the sound construction and application of the "direct physical loss" requirement stated in so many cases, including *Philadelphia Parking Authority, Source Food*, and *Pentair*.

Further, emerging decisions concerning recent claims similar to Plaintiff's show that there is no physical loss or physical damage as required for coverage under similarly worded policies. They hold that the Coronavirus and related closure orders do ***not*** cause "physical," i.e., actual, tangible, structural, loss or damage to property. *See, e.g., Gavrilides*, Case No. 20-258-CB-C30 (July 2, 2020, Ingham County, MI); *Social Life Magazine*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15. Both *Gavrilides* and *Social Life* involved business income and civil authority claims relating to the Coronavirus. These claims involved policy language like that at issue here.

In the present case, as in the precedents Cincinnati relies on, there was no direct physical loss. Plaintiff does not allege anywhere in its Complaint that the Coronavirus physically altered its property. Indeed, even at premises where the virus has been confirmed to be present, such as hospitals and nursing homes, the buildings have remained open. This is because those buildings and properties are themselves undamaged. Moreover, as shown, Plaintiff does not even assert that the virus was ever present on its premises.

The financial losses Plaintiff asserts do not constitute direct physical loss to property. Thus, there can be no Business Income, Extra Expense, or Extended Business Income coverage here.[8]

---

[8] As noted, the Extended Business Income coverage does not apply unless the insured first sustains a "'Business Income' 'loss' payable under [the Policy]." (Policy, pp. 40 & 81-82; Renewal Forms, pp. 22 & 45). As established, the Plaintiff did not sustain a Business Income "loss" payable under the Policy because it did not sustain losses as a result of direct physical loss as required by the Policy. Thus, the Extended Business Income coverage does not apply.

**B.      Coronavirus Does Not Affect the Structural Integrity of Property Because it Can Be Removed by Cleaning**

There is no direct physical loss in situations where a contaminant or substancee can be cleaned. *See*, *e.g.*, *Mastellone v. Lightening Rod Mutual Insurance Company*, 2008-Ohio-311 ¶ 68, 175 Ohio App. 3d 23, 884 N.E. 2d 1130, 1144 (2008) (no direct physical loss because mold on exterior siding could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity of the siding), *citing* 10A *Couch on Ins.* § 148:46 (3d Ed.1998). *See also Mama Jo's, Inc. v. Sparta Ins. Co.,* 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[W]ith regards to Plaintiff's initial claim for cleaning, cleaning is not considered direct physical loss."); *Universal Image Prods., Inc. v. Chubb Corp.*, 703 F.Supp.2d at 710 (E.D. Mich. 2010) (a complete cleaning of a ventilation system was not a direct physical loss), *aff'd*, 475 Fed.Appx. 569 (6th Cir. 2012).

The Centers for Disease Control and Prevention (CDC) instruct that the Coronavirus can be wiped off surfaces by cleaning: "The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes." (*See* CDC Reopening Guidance for Cleaning and Disinfecting (4/28/2020), attached as Exhibit F; *See also* CDC, *Cleaning and Disinfection for Households*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html (accessed July 20, 2020)).[9] Thus, even where the Coronavirus is or was actually present on property at Plaintiff's business, there is no direct physical loss because the virus either dies naturally in a short time, or it can be wiped away.

---

[9] Again, this Court may take judicial notice of the CDC reports and other matters of public record without converting Cincinnati's motion to dismiss to a motion for summary judgment. *See, e.g., Hynoski*, 941 F. Supp. 2d at 555.

**C.    The Lack of a Virus-Related Exclusion is Irrelevant Because There is No Direct Physical Loss**

Plaintiff claims that coverage exists because the Policy does not contain an exclusion "for losses caused by a virus or by governmental orders issued in order to prevent exposure to a virus." (Compl. at ¶ 18). That assertion is legally incorrect. An exclusion can become relevant only if Plaintiff first meets its burden of showing that there is direct physical loss. As established, Plaintiff cannot do so.

Where an insured fails to meet its burden to show an initial grant of coverage, judgment in favor of the insurer is appropriate. *See, e.g., Fry v. Phoenix Ins. Co.*, 54 F. Supp. 3d 354, 361 (E.D. Pa. 2014) (applying Pennsylvania law) (Stengel, J.), *citing Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013). For instance, in *Fry*, the parties submitted competing evidence concerning whether the policy's wear and tear exclusion applied to preclude coverage for the collapse of an exterior stone veneer wall. *Fry*, 54 F. Supp. 3d at 363-365. But, because the insured's knowledge of existing defects in the wall precluded an initial grant of coverage under the policy's collapse coverage, the exclusion was irrelevant. *Fry*, 54 F. Supp. 3d at 363-365. Likewise, in *Estate of O'Connell*, it was irrelevant whether the trial court misconstrued policy exclusions, because the vehicle involved in the accident did not qualify as an underinsured motor vehicle in the first instance. *Estate of O'Connell,* 79 A.3d at 1138-1141.

Courts throughout the Country agree: where there is no direct physical loss, there is no coverage, irrespective of whether there is a potentially applicable exclusion. Given this fact, policy exclusions are irrelevant here. *See*, *e.g.*, *Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co*., 114 Cal. App. 4th 548, 555, 7 Cal. Rptr. 3d 844, 850 (2003) (database crash did not constitute direct physical loss; therefore, it was "unnecessary to analyze the various exclusions and their application to this case"); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.,* 17 F.

18

Supp. 3d 323, 333 (S.D.N.Y. 2014) (power outage that caused law firm to close was not direct physical loss; thus, it was unnecessary to decide whether a flood exclusion applied), citing *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 9, 751 N.Y.S.2d 4, 10 (2002).

As established, Plaintiff cannot show the threshold requirement of a Covered Cause of Loss. Covered Cause of Loss means all risks *of direct physical loss* that are neither excluded nor limited. Thus, if there is no direct physical loss in the first place, the existence or absence of an exclusion is irrelevant. (Compl. at ¶ 19).

In sum, there is no coverage here because there is no direct physical loss. For that reason, no exclusion is needed.

### III.     There Is No Civil Authority Coverage

As established, the Policy's Civil Authority coverage only applies if there is a Covered Cause of Loss, meaning direct physical loss that is not excluded or limited, to property other than the Plaintiff's property. Even then, there is only Civil Authority coverage if, among other things, the action of the civil authority prohibits access to the insured premises. (Policy, pp. pp. 39 & 81; Renewal Forms, pp. 21 & 44). "[L]osses due to curfew and other such restrictions are not generally recoverable. * * * If a policy provides for business interruption coverage where access to an insured's property is denied by order of civil authority, access to the property must actually be specifically prohibited by civil order, not just made more difficult or less desirable." 11A *Couch on Ins.* § 167:15.

#### A.     There is No Direct Physical Loss to Other Property

Plaintiff alleges no direct physical loss to property other than property at the Plaintiff's premises. This is a necessary element of the Civil Authority coverage. Courts nationwide have upheld that requirement. *See, e.g., Philadelphia Parking Auth.*, 385 F. Supp. 2d at 289 (applying

19

Pennsylvania law); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.,* 2020 WL 886120, 8 (D.S.C. Feb. 24, 2020); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.,* 2011 WL 13214381, 6 (E.D. Tex. Mar. 30, 2011); *S. Texas Med. Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, 10 (S.D. Tex. Feb. 15, 2008); *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 131 (2d Cir. 2006).

Just as the Coronavirus is not causing direct physical loss to the Plaintiff's premises, it is not causing direct physical loss to other property. The Complaint fails to identify any distinct, demonstrable, physical alteration of property, anywhere. Rather, it alleges that as a result of the Closure Order Plaintiff ceased "all operations on March 13, 2020 and continues to be shutdown (sic)." (Compl. at ¶ 35). No facts are alleged that demonstrate that there was direct physical loss to anybody's property. Instead, as the Plaintiff admits, the Closure Orders and CDC guidance are intended to reduce or eliminate the increased danger of people contracting COVID -19. (Compl. at ¶ 23).

There are no alleged facts asserting any direct physical loss. There are no alleged facts showing any change or alteration of anybody's physical property by the Coronavirus or the Closure Orders. There are, however, facts showing that the Coronavirus can be removed via cleaning. As established, this is the marker of something that is ***not*** direct physical loss. Accordingly, there is no direct physical loss to any other property as is required for Civil Authority coverage.

## B.      The Requisite Prohibition of Access Is Lacking

The Civil Authority coverage also requires that access to Plaintiff's premises be prohibited by an order of civil authority. But, the Plaintiff does not allege the Closure Order prohibited access to its premises. Nor could it. Under Pennsylvania's Closure Order non-essential businesses,

including Plaintiff's business, remained open and accessible to owners, employees and others so that they could perform minimum basic operations.[10]

Moreover, the prohibition of access requirement for coverage is pervasive nationally. As discussed, the insured parking garage owner in *Philadelphia Parking* failed to show the FAA's order grounding flights after 9/11 prohibited access to its premises, as required for civil authority coverage under Pennsylvania law. Likewise, in *Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 WL 2696782, 4 (M.D. Pa. July 6, 2010), a bridge repair hindered or dissuaded the majority of customers from visiting a ski resort., but did not constitute prohibition of access to the premises.

To the same effect is *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004) (applying Oklahoma law) (access to hotels was not prohibited by FAA order grounding flights in response to 9/11 attacks). *See also*, *e.g.*, *Syufy Enterprises v. Home Ins. Co. of Indiana*, 1995 WL 129229, 2 (N.D. Cal. Mar. 21, 1995) (riot-related curfew prevented insured's customers from being out and about, it did not prohibit access to the insured's premises); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.,* 268 A.2d 611, 614 (D.C. 1970) (same); *Schultz Furriers, Inc. v Travelers Cas. Ins. Co. of America*, 2015 WL 13547667, 6 (N.J. Super. L. July 24, 2015) (despite serious traffic issues in lower Manhattan following Superstorm Sandy, it was not completely impossible for the public to access the insured store). *See also, Goldstein v Trumbull Ins. Co*., 2016 WL 1324197, 12 (N.Y. Sup. Ct. Apr. 05, 2016); *TMC Stores, Inc. v. Federated Mut. Ins. Co*., 2005 WL 1331700, 4 (Minn. Ct. App. June 7, 2005).

Because the Complaint's allegations establish access was not prohibited, the Civil Authority coverage does not apply.

---

[10]https://www.governor.pa.gov/wp-content/uploads/2020/04/Life-Sustaining-Business-Frequently-Asked-Questions-4.20.20-2.pdf (see pg. 4 at ¶ 14).

**IV.** **Conclusion**

For the reasons established above, the Motion to Dismiss of The Cincinnati Insurance Company should be granted.

Respectfully submitted,

**LITCHFIELD CAVO LLP**

BY:   /s/ Lawrence M. Silverman
        Lawrence M. Silverman
        (Bar ID No. 17854)
        Daniel G. Litchfield
        (Bar ID No. 75064)
        1515 Market Street, Suite 1220
        Philadelphia, PA  19102
        Telephone:  215.557.0111
        Facsimile:  215.557.3771
        silverman@litchfieldcavo.com
        litchfield@litchfieldcavo.com

July 20, 2020

## UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF PENNSYLVANIA

Lawrence M. Silverman, Esquire
Identification No. 17854
silverman@litchfieldcavo.com
**LITCHFIELD CAVO LLP**
1515 Market Street, Suite 1220
Philadelphia, PA 19102
215-557-0111
215-557-3771 fax

Attorney for Defendant,
The Cincinnati Insurance Company

---

CHESTER COUNTY SPORTS ARENA          :
                                     :
                        Plaintiff,   :     Case No. 2:20-cv-02021-TJS
                                     :
              v.                     :
                                     :
THE CINCINNATI INSURANCE COMPANY     :
                                     :
                        Defendant.   :
                                     :
                                     :

---

## <u>CERTIFICATE OF SERVICE</u>

I, Lawrence M. Silverman, hereby certify that a true and correct copy of the Motion by the Cincinnati Insurance Company to Dismiss Plaintiff's Amended Complaint was electronically filed and served of record on this 20th day of July, 2020, and notice was sent by the Court's e-filing system to all counsel of record, addressed as follows:

Arnold Levin, Esquire
Laurence S. Berman, Esquire
Frederick S. Longer, Esquire
Daniel C. Levin, Esquire
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
alevin@lfsblaw.com
lberman@lfsblaw.com
flonger@lfsblaw.com
dlevin@lfsblaw.com

**LITCHFIELD CAVO LLP**

**BY:** _____

**LAWRENCE M. SILVERMAN**